11 VICTORY, J.,
dissenting.
I dissent from the majority opinion. For the reasons discussed below, I find that the Judiciary - Commission was not manifestly erroneous in concluding that all three charges against Judge Johnson were proven by clear and convincing evidence.

Charge 0150 (Failure to Render Timely Non-Support Judgments)

Louisiana Supreme Court Administrative Rule G, Section 2 sets forth the standards when a case or matter is considered as fully submitted and the time periods for deciding such matters, allowing'for a maximum of ninety-five days from the time a case or matter is fully submitted to the time it is to be signed.[1] Furthermore, *432 under lathe rales of the East Baton Rouge Parish Juvenile Court in effect during the relevant period, non-support cases in juvenile matters are handled on an expedited basis, and the time periods involved are even shorter than those provided in Rule G, Section 2. Charge 0150 specified 36 nonsupport cases in which Judge Johnson failed to sign judgments for periods ranging from three months (just under 95 days) to over two years. In fact, the Commission constructed a chart/table illustrating these delays in signing judgments. The chart noted the dates the matters were heard, the dates the proposed judgments were filed, and the dates the judgments were finally signed. It should be noted that, in 25 of these cases, Judge ad hoc Marcia Harris-Burden actually signed the judgments rather than Judge Johnson. The Commission found that Judge Johnson failed to render judgments in a timely manner in violation of Canons 1, 2 A, 3 A(7), and 3 B(l) of the Code of Judicial Conduct.
As evidence of Judge Johnson’s violations of these Canons in regard to the nonsupport judgments, the Commission considered the testimonies of the Hearing Officer Patrick Bella, Judge Kathleen Richey (who served with Judge Johnson), Judge ad hoc Marsha Burden, and Judge ad hoc Etta K. Hearn, as well as the dates of the signing of the judgments in regard to the submission of the proposed judgments. In defense, Judge Johnson testified on her own behalf and offered testimony by her law clerk, Michael Smith.
Hearing Officer Bella testified that the signing of a non-support judgment triggers the opening of a case and that, if the judgment remains unsigned, people who are supposed to get money do not receive it. In Judge Johnson’s jurisdiction, once | ¡judgments became enforceable, the district attorney’s office would type the judgments and return them to the juvenile clerk to file and date stamp. Judge Johnson initiated a system in which her clerk *433 ordered the record, attached the case file to the proposed judgment, reviewed them both, and brought both to Judge Johnson for her signature. Judge Richey did not require that the file and proposed judgment be attached before she signed the judgments.
Bella testified that, initially, the difficulty with signing judgments in a timely fashion was court-wide, so, in order to expedite the process, he offered to review the proposed judgments for correctness prior to presenting them to the judges. He continues to do so for Judge Richey, who has had no further difficulty signing her judgments in a timely fashion, but Bella does not do so for Judge Johnson. She insisted on having her clerk continue to attach the case files to the proposed judgments and review them in order to “have a checker check the checker.”
Judge Richey testified that it only takes her “a minute” to sign non-support judgments and that she signs between 30 and 50 per week. Judge ad hoc Marsha Burden testified that it took her an average of 10-15 minutes to review a proposed judgment and that few had any errors. Even Judge Johnson’s clerk testified that only 10% of the proposed judgments appeared to have any errors in them. Judge Burden further testified that, on two separate occasions when she substituted for Judge Johnson, she found large stacks of unsigned judgments, one of which amounted to 225 unsigned judgments. Judge ad hoc Etta K Hearn also testified that she observed old judgments being presented for signing while she was serving temporary appointments.
Judge Johnson testified in defense of her procedure, deeming it critical that her law clerk carefully examine each judgment before she signed it. She insisted that her 14procedure of having the case file obtained and attached to the proposed judgment did not in any way delay the issuing of -the judgments. Judge Johnson claimed that she was unwilling to rely on Hearing Officer Bella’s review of the proposed judgments because she was the one ultimately responsible for the judgments. She wanted to insure that due process and constitutional rights were satisfied in each case. However, Judge Johnson’s clerk, Michael Smith, testified that he needed large blocks of time in order to pay “meticulous attention” to the proposed judgments. Furthermore, his review might not even begin until over a month after receipt of the proposals. Despite Judge Johnson’s claims to the contrary, the fact that she had a backlog of up to 225 unsigned judgments at any given time presents strong evidence that her system created a delay in the signing of non-support judgments. This conclusion is further bolstered by the fact that Judge Richey has had no backlog since Hearing Officer Bella began reviewing proposed judgments for her and by the testimony of other judges that review of proposals is not normally a lengthy process.
The Commission heard testimony from four credible witnesses as to the delay in signing judgments created by Judge Johnson’s review system. The 36 unsigned judgments in Judge Johnson’s division, as compared to none reported in Judge Rich-ey’s, also stand as solid evidence of a dilatory process. Finally, even Judge Johnson’s clerk testified as to the protraction of the review process. When balanced against Judge Johnson’s testimony, in which she admitted ultimate responsibility for the finalizing of judgments, the record shows clear and convincing evidence of her failure to dispose of judicial matters promptly, efficiently, and fairly in violation of Canon 3 A(7) and to have violated Canons 1 and 2 A requiring that a judge follow the law and maintain high standards of *434 conduct. Finally, the same evidence meets the burden required to show a violation of Canon 3 B(l), militating that judges maintain [ .^professional competence in court and judicial administration.
The majority notes:
The Commission rejected Judge Johnson’s defense that she signed judgments soon after they were presented to her, finding the cases in question were submitted at the time the hearing officer made his recommendation and the time period for appeal had lapsed. The Commission explicitly noted that Judge Johnson created a system that delayed judgements from being presented to her.
I agree with this statement, but the majority, while acknowledging that “[o]f the thirty-six [delayed decisions], twenty-five had delays between three and six months, eight had delays between eight months and one year, and three had delays of two years or more,” simply rejects the Judiciary Commission’s findings.[2]

Charge 0206 (Failure to Cooperate with Judge Salvadore T. Mulé)

The original order appointing Judge Mulé specifically stated that he was “to assume and to discharge all the administrative duties and all the administrative responsibilities of Juvenile Court for the Parish of East Baton Rouge.” The order further stated that “the judges of Juvenile Court for the Parish of East Baton Rouge Judges Kathleen Richey and Pamela Taylor Johnson are hereby relieved of and shall not assume or discharge any administrative duties or any administrative responsibilities of Juvenile Court for the Parish of East Baton Rouge, without the prior approval of Supernumerary Judge pro tempore Retired Judge Salvadore T. Mule .” (emphasis added)
Judge Mule’s appointment to the East Baton Rouge Juvenile Court stemmed in part from tension between Judges Richey and Johnson. Apparently, a dispute took place over which judge was to be “chief judge” of the court, resulting in a rule in which Judge Johnson would be “chief judge” in odd-numbered years and Judge | fiRichey in even-numbered years. Another dispute occurred when Judge Johnson applied for a federal grant to establish the East Baton Rouge Parish Drug Court and the Straight and Narrow Drug Treatment Center (“SAND”). Evidently, Judge Johnson listed Judge Richey and at least three other public officials.as “stakeholders” on the application when none of these officials had given permission for their names to be used.[3] Thus, the relationship between Judges Richey and Johnson might be described as strained, at best.
Many of the difficulties between Judge Mulé and Judge Johnson centered around the drug court and SAND. Most significantly, Judge- Johnson acted and/or attempted to act administratively with regard to these entities, even though this Court had clearly relieved her of any administrative authority. Some of the problems stemmed from Judge Johnson’s failure to provide Judge Mulé with information he requested in regard to the drug court and SAND. Initially, Peter *435 John, the director of SAND, refused to comply with two memoranda from Judge Mulé requesting copies of checks and documents to provide to court auditors. It should be noted that the Commission found that Judge Johnson was not responsible for Peter John’s disregard of any requests by Judge Mulé. However, in response to Judge Mule’s request for the copies of checks, Judge Johnson wrote him a memo requesting “necessary source information” about reimbursements the drug court owed the juvenile court. The memo further stated, “Once the source documentation has been received and there is an opportunity to review the same, within a day or two, a check or checks will be immediately issued in the amount or amounts that are supported by the documentation. This is my commitment to you.” In another memo regarding |7reimbursement checks from SAND to the juvenile court, Judge Johnson wrote, “I will review the information you provided ... Upon completion of a review.of the source documents provided the drug court program’s records, a determination will be made as to the amount that is to be reimbursed to the general and/or judicial expense fund.” Clearly, the language in these memos indicates that Judge Johnson was exercising or attempting to exercise administrative authority over the drug court and SAND in April 2001, despite the order from this court relieving her of any administrative authority in February of that year. The majority specifically notes that Judge Johnson acted administratively with regard to the program by “questioning] the nature and validity of the debt, and requesting] a response from Mr. John with a deadline imposed. Judge Johnson further advised Mr. John that she was scheduling mandatory training for all S.A.N.D. professional staff.” All of these actions are in direct violation of this Court’s order relieving her of any administrative authority.
Judge Johnson testified that she did not realize that the order from this Court in February 2001 relieved her of administrative authority of the drug court and SAND, and thus her activities in April of that year could not be construed as contravening this Court’s directive. Her contention is belied by a memo she wrote to Judge Mulé on June 22, 2001, in which she referenced the need for SAND to adopt certain proposed rules, a strong indication of her belief that Judge Mulé had administrative authority over that program and that she understood the order of this Court to require her to seek Judge Mule’s approval of matters affecting SAND and the drug court. In fact, Judge Johnson even testified that, at the beginning of Judge Mulé’s term, she thought “he was just trying to get information so he could find out what was happening at the court and work with the court for all the programs. It became clear later on that that wasn’t what he was doing....” This testimony, in ^conjunction with the timing and increased intensity of difficulties between Judge Johnson and Judge Mulé, strongly suggests that her “misunderstanding” of this Court’s order coincided with the disagreement over how and whether the drug court and SAND should operate. In any event, the order from this Court says exactly what it says — Judge Johnson was “relieved of and [was] not [to] assume any administrative duties or any administrative responsibilities.”
However, even accepting Judge Johnson’s claim as true, any misconstruction must have been cleared up by Justice Kim-ball’s letter of July 16, 2001, stating as follows:
The purpose of this letter is to clarify any confusion which may exist concerning the nature and scope of Retired *436 Judge Salvador (sic) Mule’s duties at Juvenile Court for the Parish of East Baton Rouge ...
It is abundantly clear to me that the Court’s Order encompasses all Juvenile Court programs, including the Drug Court and Treatment Center. As such, Judge Mulé has sole and exclusive decision-making authority with regard to administration of the Drug Court and the Treatment Center. During the term of Retired Judge Mule’s assignment, neither Judge Johnson nor Judge Richey is to be considered the supervisor of Mr. John, nor are Judges Johnson or Richey to be involved in any way in the administration of the Drug Court or the Treatment Center, (emphasis added)
Unmistakably and in no uncertain terms, this letter again relieved Judge Johnson of any administrative authority over the drug court and SAND.
Nonetheless, Judge Johnson continued to handle certain administrative matters in relation to the drug court and SAND. In September 2001, Judge Johnson contacted the U.S. Department of Justice regarding a prospective visit to SAND, never informing Judge Mulé about the visit. Judge Johnson also made a public statement to a newspaper vowing to secure funding for SAND despite her removal as supervisor of the drug court. She also refused to supply a copy of a contract reflecting Peter John’s salary for $67,000 as opposed to one for $40,000.
IflThe majority opinion finds that clear and convincing evidence exists only of Judge Johnson’s failure to inform Judge Mulé of the meetings with auditors, the Justice Department, and the FBI, and of her failure to provide Judge Mulé and the auditors with a copy of the latest employment contract for Peter John. In regard to Judge Johnson’s behavior prior to Justice Kimball’s letter of July 16, 2001, the opinion states only that, “[tjhere was apparently some turmoil regarding Judge Mule’s role as Supernumerary Judge and whether his appointment included supervision of the Drug Court program.” The opinion remains conspicuously devoid of specifics on this issue and is distinctly silent as to Judge Johnson’s testimony or her initial memo seeking Judge Mulé’s approval for proposed rules for SAND. Instead, the opinion states only that “Judge Johnson denied that she failed to obey the orders of Judge Mulé while he was acting administrative judge.” Such testimony might be characterized as self-serving and certainly should not override all other evidence in regard to Charge 0206. In fact, in its Findings of Fact and Conclusions of Fact and Law, the Judiciary Commission found Judge Johnson’s claim that she had misunderstood the initial order to be “doubtful” and further found her behavior following Justice Kimball’s “crystal clear” memo to merit discipline. Furthermore, in regard to Judge Johnson’s testimony, the Commission found that, “taken as a whole, [it] convinces the Commission that Judge Johnson’s attitude and conduct changed because she suspected Judge Mule might make decisions about the drug treatment center that she viewed as negative or erroneous” and that her behavior was a means of “ignoring or thwarting him.”

Charge 0207 (Refusal to Obey Directive in Regard to SAND)

Judge Mulé decided to close SAND when its funding from a federal grant was expended. On September 14, 2001, he informed Judge Johnson via memo that SAND hnwould be closing and that it would be necessary for her to conduct further dispositional hearings in conjunction therewith. In response, Judge Johnson sent a letter, dated September 14, 2001, refusing to participate in the discontinuation of the program. This Court then *437 appointed Judge Ann Murry Keller of the Jefferson Parish Juvenile Court “for the purposes of expeditiously presiding over further dispositional hearings for juveniles who are currently receiving treatment from [SAND].” When Judge Keller went to the East Baton Rouge Juvenile Court on September 27, 2001, to conduct the dispositional hearings, Judge Johnson appeared in court and remained in the audience throughout the entire proceedings and gave input on the proceedings as they progressed. Furthermore, Judge Keller testified that Judge Johnson’s presence made her feel uncomfortable and that participants did not display ordinary openness, instead following “pretty much whatever Judge Johnson said.”
The majority opinion finds that Judge Johnson’s behavior in this matter was vio-lative of Canons 1 and 3 B(l), as well as of La. Const, art. V, § 25(C), and thus it is not necessary to discuss those provisions. Incredibly, the majority finds that “the evidence does not establish that Judge Johnson refused to conduct any ‘disposi-tional’ hearings,” despite the specific language in Judge Johnson’s letter to Judge Mulé, wherein she stated:
You have decided that the Drug Treatment Center should be closed; thus, you as the maker of that decision have the responsibility of finding treatment for the children and families who are currently receiving treatment. In light of your decision to discontinue treatment from substance abusing children, I cannot assist you in depriving children of drug treatment.
Further, this Court appointed Judge Keller to handle the dispositional hearings because Judge Johnson would not conduct them.
Judge Johnson testified at the hearing that she knew in advance that Judge Keller was coming to conduct the dispositional hearings because Judge Mulé had told [nher so. As the Judiciary Commission found, “If Judge Mule’s interpretation of Judge Johnson’s letter was incorrect and Judge Johnson was willing to conduct the necessary proceedings, Judge Johnson’s prior knowledge of Judge Keller’s arrival provided her time to disabuse Judge Mule of his erroneous notion and to arrange to conduct the ... hearings herself.” Furthermore, Judge Johnson testified that she sat in on these hearings in order “to assist [Judge Keller] and the families with everything that was going on” and to avoid their confusion as to “what’s wrong [and] why are you not hearing my cases.” If Judge Johnson truly had wished to help Judge Keller, she might have asked whether Judge Keller wanted her there. If she wished to avoid confusing the families, she would not have attended the hearings. Instead, she elected to sit in on and comment during these hearings while Judge Keller was presiding over them.
In conclusion, the Judiciary Commission found facts that show Charges 0150, 0206, and 0207 were proven by clear and convincing evidence, clearly rejecting Judge Johnson’s contentions. The Judiciary Commission heard the witnesses, including Judge Johnson, and concluded that she had committed these violations. I agree and would impose the sanction recommended by the Commission.

. La. Sup.Ct. Admin.. Rule G, § 2 states as follows:
(a) When Submitted. A case or other matter shall be considered as fully submitted *432 for decision to the trial judge, and should be decided, immediately upon the conclusion of trial or hearing, and judgment signed expeditiously thereafter.
In an exceptional case when the record has been left open upon the conclusion of trial or hearing for the filing of testimony by deposition and/or documents, such depositions and/or documents shall be filed within fifteen days and the case or matter shall be considered as fully submitted, and should be decided, immediately after such filing or the lapse of fifteen days, whichever occurs sooner.
If the court, in an exceptional case, orders post-trial or post-hearing briefs, or orders the transcript prepared, plaintiff shall be allowed a maximum of twenty days within which to file a brief; defendant shall be allowed a maximum of twenty days from the filing or laps of time for filing plaintiff s brief (whichever occurs sooner) within which to file a brief. If the defendant timely files a brief, plaintiff shall be allowed a maximum of ten days to file a rebuttal brief. When briefs are so ordered, the case or
matter shall be considered fully submitted on the day following the day of the latest timely filing of a brief or, at the latest, the day following the last day for filing of briefs. The judge may extend the time for filing a brief for a reasonable period not to exceed the original time granted.
If a transcript of the evidence, in an exceptional case, is deemed essential and is ordered by the court, it shall be filed within thirty days following the conclusion of trial or hearing. When necessary, for good cause shown, one extension may be granted by the judge not to exceed an additional fifteen days for filing of the transcript.
(b) Reports. Each judge of a district, juvenile, family, parish, city municipal or traffic court shall report to the court, through the office of Judicial Administrator, on or before the tenth day of each month, all cases which have been fully submitted and under advisement for longer than thirty days, together with an explanation of the reasons for any delay and an expected date of decision. (emphasis added)

. The majority "declines to impose discipline" relating to Charge 0150. Such action would appear to be obvious since the majority finds that Judge Johnson did not commit the violations in Charge 0150.

. This dispute formed part of the basis for this Court's per curiam opinion in In re Johnson, 00-0392 (La.6/30/00), 767 So.2d 2. Although this Court held that Judge Johnson's actions did not rise to the level of judicial misconduct in that case, it should be noted that three Justices dissented and that the very court at issue in the previous Johnson matter figures prominently in the matter sub judice.